JOURNAL ENTRY AND OPINION
{¶ 1} Jerome Carter ("Carter") appeals from his conviction received in the Cuyahoga County Court of Common Pleas. Carter argues that the State of Ohio ("State") failed to present sufficient evidence to support his conviction, that his conviction is against the manifest weight of the evidence, that the trial court erred when it instructed the jury, and that the trial court erred when it denied his motion to suppress. For the following reasons, we affirm the decision of the trial court.
 {¶ 2} In the early morning hours of November 7, 2004, an unidentified man rang the doorbell of the Cleveland Fire Department Engine 26 and informed Firefighter Martin McGreal ("McGreal") that there was a body located on East 83rd Street and Rawlings. McGreal notified dispatch and several firefighters responded to the intersection. McGreal arrived and located the dead body of a male lying face down at the corner of the intersection.
 {¶ 3} Renee O'Neill ("O'Neill"), a Cleveland paramedic, responded to a call from dispatch of a man down on East 83rd and Rawlings. O'Neill arrived at 7:58 a.m. and noted that several firefighters were already on the scene when she arrived. O'Neill stated that it was possible that the victim had not been dead for long because his chest and neck still felt warm. O'Neill also stated that there was a small hole near the victim's kidneys, numerous holes in his buttocks and lower thighs, and extensive trauma to the right side of his face. O'Neill's partner removed the victim's wallet from his pocket and identified the victim as Louis Karamas Jr. ("Karamas"). Karamas was pronounced dead on arrival. Cleveland homicide detectives Henry Veverka ("Detective Veverka"), and James Metzler ("Detective Metzler") arrived at the scene at approximately 8:30 a.m. Detective Veverka described the area around the crime scene as a vacant, underdeveloped trash yard. After noticing a large amount of blood in the area, the detectives contacted the scientific investigation unit to photograph the scene. Officers recovered five spent shell casings from the scene and a spent shell pellet from the trunk of Karamas' car. Upon further investigation, three more pellets were found in Karamas' car and five pellets were recovered from the morgue.
 {¶ 4} Dr. David Dolinak ("Dr. Dolinak"), an assistant Cuyahoga County Coroner, examined the body of Karamas on November 8, 2004. Dr. Dolinak noted multiple gunshot wounds and tears in the skin of the victim's scalp. The gunshot wounds were centered on Karamas' buttocks, and bullets were discovered in the body. Dr. Dolinak explained that the tears in Karamas' scalp were caused by a blunt force injury from a firm object. Dr. Dolinak stated that Karamas had an extensive skull fracture that went all the way across his head. Dr. Dolinak further observed that there was bleeding, bruising, and tearing of Karamas' brain tissue, which indicated that Karmas was alive at the time of the head injury. Dr. Dolinak stated that Karamas sustained eight gunshot wounds and at least seven blows to the head. Dr. Dolinak reported that either the blunt force trauma or the gunshot wounds could have caused Karamas' death. The official cause of death was multiple gunshot wounds of the torso and extremities, and the blunt force head injury.
 {¶ 5} On November 6, 2004, the day before Karamas' body was found, he and his father, Louis Karamas Sr., spent the afternoon together. The two washed and waxed Karamas Jr.'s new car and installed special rims on the tires. Karamas' father stated that his son had purchased the 1996 dark green Buick three or four days prior. After working with his father, Karamas went out and returned home at around 1:30 a.m. At approximately 2:00 a.m., Karamas received a phone call and decided to go back out. That was the last time the family saw Karamas alive.
 {¶ 6} That same evening, Carter and co-defendant Richard Glenn ("Glenn") were at the Harry Buffalo in Akron, Ohio. Glenn stated that he rode to the bar with Carter, who drove a grey Ford Taurus with Georgia plates. Co-defendant Joseph Gray ("Gray") was also at the Harry Buffalo, and the trio had a conversation regarding a previous altercation between Gray and Carter. When the bar closed at 2:30 a.m., Carter and Glenn went to the Spring Hill apartments to visit a friend. Gray, who also lived in the complex, met up with Carter and Glenn in the lobby. While in the lobby, Gray told Carter and Glenn that he had seen Karamas' new rims and wanted to rob Karamas of them. Karamas knew all three individuals from either work or social encounters.
 {¶ 7} At the request of Gray, Karamas arrived at the Spring Hill apartments in his new car. From that point, Karamas and Gray drove in Karamas' car and Carter and Glenn drove in Carter's car. The group drove around for a while before ending up at the intersection of Archwood and Inman at the home of a stripper. When they arrived at 3:30 a.m., no one was at the house. Karamas and Gray exited Karamas' car and stood by Carter's passenger side door. Glenn stated that Carter had a fake conversation on his cellular phone to throw Karamas off. Gray and Karamas walked back to Karamas' vehicle and got inside. The pair then exited the vehicle, looked in the trunk, and then got back into the car.
 {¶ 8} After Gray and Karamas re-entered the car, Glenn heard Karamas saying "please don't do this, c'mon, you ain't got to do this." Gray then began hitting Karamas with a handgun and threatened to shoot him if he didn't get into the trunk. At that point, Glenn attempted to exit the car, but Carter prevented him. Gray got Karamas into the trunk of his own car but could not shut the trunk. Carter told him to slam it harder and Gray was able to close the trunk. Gray then got into the driver's seat of Karamas' vehicle. Carter stated that they were going to take Karamas to Cleveland and let him go because Karamas did not know anyone there.
 {¶ 9} Carter led the way out of Akron, stopping for gas along the way. Carter drove the caravan through the Garden Valley projects on East 79th and Kinsman but stated that the location was "too hot." Carter continued on to East 83rd and Rawlings where he stopped his car. Carter got out of his car and walked over to Gray, who popped the trunk of Karamas' vehicle. While walking to the back of Karamas' car, Carter told Glenn to get out of the vehicle. Glenn complied and when he reached Karamas' driver's side door, he heard several gunshots fired in rapid succession. Glenn stated that both Carter and Gray were standing behind the trunk when the gunshots were fired.
 {¶ 10} Glenn reported that he saw Carter with a handgun and admitted that he had seen the gun on Carter before. Carter then told Gray and Glenn to help him get Karamas out of the trunk. Glenn stayed put while Gray pulled Karamas out of the trunk. Glenn stated that he observed Karamas crawling and moaning on the ground and then witnessed Gray hit Karamas on the head with a hammer retrieved from the trunk of the car. Glenn stated that Karamas did not move after that.
 {¶ 11} Gray dropped the hammer on the ground but Carter yelled for him to pick it up. Carter then told Gray to follow him in Karamas' car. Carter got into his car and began to drive away. As he did so, Carter stated "I can't believe the [expletive omitted] was still breathing after I unloaded the clip." Carter further stated that he shot Karamas because "he knew you all."
 {¶ 12} Carter drove to Jermel Moses' ("Moses") house on East 144th and Kinsman. Moses stated that Carter was an old friend of his and described Carter as the brother he never had. Moses stated that in the early morning hours of November 7, 2004, Carter knocked on his door and told him to look in his backyard. Moses complied and saw a green Buick with rims parked behind a Ford Taurus. Carter told Moses that the car was stolen and that he was there to take the rims off of the vehicle. Carter told Moses everything that had happened and stated that he was the one who shot Karamas. Gray also told Moses that he was the one who shot Karamas but Moses stated that he did not believe Gray, as he was known for embellishing.
 {¶ 13} The parties recovered the special key needed to remove the rims and began removing the tires. While doing so, Carter told Gray to clean the blood off of the hammer. Once the rims were off of the car, Carter took two rims with him and left two on the porch of Moses' house. Gray then backed Karamas' vehicle out of the driveway and began driving away. However, after moving only a few feet, one of the tires fell off of the vehicle. Carter decided that they would have to burn the car because their fingerprints were all over the car. Gray poured charcoal fluid throughout the interior of the car while Carter and Glenn drove one street over to wait for Gray to burn the car. Gray arrived but stated that the car would not burn. Carter then ordered Glenn to burn the car.
 {¶ 14} Carter drove Glenn and Gray to a nearby gas station where Glenn filled a twenty-ounce ginger ale bottle with gasoline. Glenn poured the gasoline and started the fire with his lighter. Glenn stated that the car caught fire quickly, singeing his hair and eyelashes. Carter, Gray, and Glenn then went to the home of one of Carter's girlfriends and then to a bar in Akron. During the drive to Akron, Carter threatened to kill Glenn and his daughter if he said anything.
 {¶ 15} On November 10, 2004, Glenn was in Cleveland visiting his mother when he ran across Carter and Gray. Carter told Glenn to follow him while he went to Moses' house to pick up the remaining two rims. While in Moses' driveway, Glenn stated that he saw a police car drive by. The group drove away but a high speed chase ensued between the police and Carter in his Ford Taurus and Glenn in his white Buick Regal. The officers were able to stop and apprehend Glenn, while Carter and Gray abandoned the vehicle and got away. Carter was arrested on November 29, 2004, in Summit County and the FBI fugitive task force arrested Gray on February 7, 2005, in Forest City, Arkansas.
 {¶ 16} On November 29, 2004, Detectives Veverka and Metzler drove to the Summit County Jail and interviewed Carter. In his statement, Carter claimed that Gray robbed and killed Karamas and that he was just with the wrong people at the wrong time.
 {¶ 17} On November 24, 2004, the Cuyahoga County Grand Jury returned a six-count indictment against Carter, charging him with two counts of aggravated murder with firearm and felony murder specifications, two counts of aggravated robbery with firearm specifications, one count of kidnapping with a firearm specification, and one count of arson. Carter pleaded not guilty and exercised his right to a jury trial.
 {¶ 18} Prior to the commencement of trial, Carter moved the trial court to suppress his oral statement given to Detectives Metzler and Veverka of the Cleveland Police Department. The trial court conducted an oral hearing and heard testimony from Detective Metzler and Carter. Detective Metzler testified that he read Carter his Miranda rights from an advice of rights card and then read the contents of the card into evidence. Detective Metzler stated that Carter understood his rights and agreed to speak voluntarily with the detectives. Detective Metzler did state, however, that Carter did not wish to provide a written statement without an attorney.
 {¶ 19} Detective Metzler also testified that he and Detective Henry Veverka ("Detective Veverka") took notes during their interview with Carter. Detective Metzler stated that he compiled his notes with Detective Veverka's notes onto a form 10, which is a summary of the oral interview. A few weeks after transcribing the notes, Detective Metzler testified that he shredded his handwritten notes.
 {¶ 20} On the stand, Carter claimed that neither of the detectives read him his Miranda rights. Carter further stated that he has never been read his Miranda rights. However, Carter admitted that he understood his Miranda rights and that he did speak freely with the detectives.
 {¶ 21} After hearing testimony, the trial court reviewed the form 10 in camera and concluded that there were no inconsistencies between the form and Detective Metzler's testimony. The trial court then denied Carter's motion to suppress his oral statement.
 {¶ 22} Carter's jury trial commenced on November 16, 2005. On November 22, 2005, the jury returned a verdict of guilty on all counts in the indictment, including the felony murder and firearm specifications. The jury concluded that Carter was not the principal offender, but found that Carter acted with prior calculation and design. The case proceeded to mitigation, and the jury recommended life imprisonment without the possibility of parole. At the time of sentencing, the trial court noted that Carter had "no perception of the gravity of what [he] did that evening." The trial court then sentenced Carter to life imprisonment without the possibility of parole.
 {¶ 23} Carter appeals, raising the four assignments of error contained in the appendix to this opinion.
 {¶ 24} In his first assignment of error, Carter argues that the State failed to present sufficient evidence to support his conviction. In his second assignment of error, Carter argues that his conviction is against the manifest weight of the evidence. Although these arguments involve different standards of review, we will consider them together because we find the evidence in the record applies equally to both.
 {¶ 25} The standard of review with regard to the sufficiency of the evidence is set forth in State v. Bridgeman (1978), 55 Ohio St.2d 261, as follows:
 "Pursuant to Criminal Rule 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."
 {¶ 26} Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, in which the Ohio Supreme Court held:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Citation omitted.)
 {¶ 27} In evaluating a challenge to the verdict based on manifest weight of the evidence, a court sits as the thirteenth juror, and intrudes its judgment into proceedings which it finds to be fatally flawed through misrepresentation or misapplication of the evidence by a jury which has "lost its way." State v. Thompkins, 78 Ohio St.3d 380,1997-Ohio-52. As the Ohio Supreme Court declared:
 "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'
 * * * The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387. (Internal Citations Omitted.)
 {¶ 28} However, this court should be mindful that the weight of the evidence and the credibility of witnesses are matters primarily for the trier of fact, and a reviewing court must not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the State has proven the offense beyond a reasonable doubt.State v. DeHass (1967), 10 Ohio St.2d 230, at paragraphs one and two of the syllabus. The goal of the reviewing court is to determine whether the new trial is mandated. A reviewing court should only grant the new trial in the "exceptional case in which the evidence weighs heavily against a conviction." State v. Lindsey, 87 Ohio St.3d 479, 483,2000-Ohio-465, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 29} In his first and second assignments of error, Carter limits his argument to his two convictions for aggravated murder. Carter does not appeal his convictions for aggravated burglary, kidnapping, or arson, nor does he appeal his convictions on the felony murder or firearm specifications. Additionally, Carter further limits this portion of his appeal by arguing only that the State failed to prove that he acted purposely.
 {¶ 30} The jury convicted Carter of two counts of aggravated murder pursuant to R.C. 2903.01(A) and (B), which state in pertinent part:
 "(A) No person shall purposely, and with prior calculation and design, cause the death of another * * *.
 (B) No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape."
In its instructions to the jury, the trial court defined purpose as follows:
 "Purpose is to cause the death of another is an essential elements (sic) of the crime of aggravated murder. A person acts purposely when it is his specific intention to cause a certain result.
 * * *
 Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result, or engaging in specific conduct.
 To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself, unless he expresses it to others, or indicates it by his conduct."
 {¶ 31} Intent can be established by circumstantial evidence. State v.Ratliff (May 8, 1997), Cuyahoga App. No. 70445. See, also, State v.Nicey (1988), 39 Ohio St.3d 147. Therefore, intent may be ascertained from the surrounding facts and circumstances in the case.Ratliff, supra.
 {¶ 32} In the present case, the State presented sufficient evidence to support its allegation that Carter acted purposely. After Gray forced Karamas into the trunk of his own car, Carter led a caravan from Akron to a remote and desolate area of Cleveland. Karamas was shot eight times while lying in the trunk of his own car. Carter told Glenn that "I can't believe the [expletive omitted] was still breathing after I unloaded the clip." Carter also told Glenn that he killed Karamas because "he knew you all." Glenn testified that he saw Carter with a handgun immediately after he heard the gunshots. Additionally, after dumping the victim's body, Carter ordered everyone to follow him to Moses' house, where he told Moses that he killed the owner of the vehicle. Carter then instructed Glenn and Gray to remove the rims of the car and burn the vehicle to destroy evidence. Finally, assistant county coroner Dr. Dolinak testified that the gunshots alone could have killed Karamas.
 {¶ 33} In response, Carter argues that the testimony of Moses established that someone other than Carter killed Karamas. Carter cites to Moses' testimony wherein Gray told Moses that he killed Karamas because the victim knew him from work. Gray also told Moses that because Karamas was still alive after he shot him, he bashed Karamas' head in with a hammer. Moses testified that he observed Gray with a handgun.
 {¶ 34} Additionally, Carter argues that the testimony of Glenn, who identified Carter as the shooter, cannot be relied upon. Specifically, Carter claims that because Glenn was facing the identical charges as Carter and entered into a plea agreement with the State, his testimony is unreliable. Moreover, Carter claims that Glenn gave conflicting statements to police regarding his involvement with the crime.
 {¶ 35} These arguments are unpersuasive. Though Moses did testify that Gray said he killed Karamas, Moses also testified that he did not believe Gray. Moses stated that Gray is known for embellishing. Additionally, Moses testified that Carter also told him that he killed Karamas. Furthermore, Moses stated that Carter was the leader of the group and controlled both Glenn and Gray's actions.
 {¶ 36} Although Glenn did give two different statements to police officers, Glenn did not waver on his identification of Carter as the shooter. Glenn's first statement to police did not detail Glenn's involvement in the burning of Karamas' car. Glenn only admitted that he burned the car in his second statement to police. However, at no time did Glenn ever identify anyone other than Carter as the shooter.
 {¶ 37} Viewing this evidence in the light most favorable to the prosecution, we find that a reasonable trier of fact would be able to conclude that Carter intended to cause the death of the victim. Therefore, we conclude that the State presented sufficient evidence on this element of aggravated murder.
 {¶ 38} We further find that the trier of fact did not lose its way in convicting Carter. Though Carter argues that the jury should have believed Gray was the shooter and therefore find that Carter did not act purposely, the jury itself is in the best position to weigh the evidence and the credibility of witnesses. The jury simply chose to believe Glenn's testimony that Carter shot Karamas. Based on the above, we cannot state that the trier of fact created such a manifest miscarriage of justice that Carter's convictions must be reversed and a new trial ordered.
 {¶ 39} Carter does not attack his convictions for aggravated murder on any additional grounds. Accordingly, Carter's first and second assignments of error are overruled.
 {¶ 40} In his third assignment of error, Carter argues that the trial court erred when it refused to instruct the jury in the lesser included offense of involuntary manslaughter.
 {¶ 41} The Ohio Supreme Court has set forth the criteria for determining when an offense is a lesser included offense of another crime. In State v. Wilkins (1980), 64 Ohio St.2d 382, the court stated:
 "An offense may be a lesser included offense of another only if (i) the offense is a crime of lesser degree than the other, (ii) the offense of the greater degree cannot be committed without the offense of the lesser degree also being committed, and (iii) some element of the greater offense is not required to prove the commission of the lesser offense."
 {¶ 42} It is well established that involuntary manslaughter, R.C.2903.04, is a lesser included offense of aggravated murder.Ratliff, supra; State v. Thomas (1988), 40 Ohio St.3d 213. However, the mere fact that an offense can be a lesser included offense of another does not mean that a court must instruct on both offenses.Ratliff, supra. The Ohio Supreme Court has stated that even though a lesser included offense has been established, a charge on that offense is warranted only if the evidence adduced at trial would support it.Thomas, supra. Additionally, the court found that "a charge on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." Thomas, supra.
 {¶ 43} Although involuntary manslaughter is a lesser included offense of aggravated murder, R.C. 2901.01(A), we find the trial court did not err in refusing to instruct the jury on the lesser offense. A review of the entire record reveals that it would have been unreasonable for the jury to have found that Carter did not act with purpose and with prior calculation and design in causing the death of Karamas.
 {¶ 44} Again, the State presented overwhelming evidence at trial that Carter led the caravan into Cleveland with Karamas inside the trunk of his own car. Carter then made the conscious decision to park his vehicle in a remote and desolate area of Cleveland. Carter approached the trunk of the car and Glenn heard several gunshots fired into the trunk. Carter then told Glenn that he couldn't believe Karamas was still breathing after he shot him, and that he had to shoot him because Karamas knew them.
 {¶ 45} It is not reasonable to conclude under these facts and circumstances that Carter did not purposely intend to cause Karamas' death. Rather, it is reasonable to conclude he intended the death of Karamas as the natural and probable consequence of shooting him eight times in the lower portion of his body.
 {¶ 46} For these reasons, the evidence presented at trial would not have supported an acquittal on the aggravated murder charge and a conviction on the charge of involuntary manslaughter. See, State v.Bailey (1992), 90 Ohio App.3d 58. Accordingly, the trial court did not err in refusing to instruct the jury on the lesser included offense of involuntary manslaughter.
 {¶ 47} Carter's third assignment of error is overruled.
 {¶ 48} In his fourth and final assignment of error, Carter argues that the trial court erred when it denied his motion to suppress and the police violated his constitutional rights when they destroyed potential exculpatory evidence. Because Carter's fourth assignment of error raises two legally distinct issues, this court will address them separately.
The trial court's denial of Carter's motion to suppress.
 {¶ 49} The Ohio Supreme Court enunciated the standard of review of a motion to suppress in State v. Burnside, 100 Ohio St.3d 152,2003-Ohio-5372.
 "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence.
 "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. (Citations omitted.)"
 {¶ 50} We therefore must consider whether the facts in the instant case demonstrate compliance with Miranda v. Arizona (1966),384 U.S. 436, 86 S.Ct. 1602, under a de novo review.
 {¶ 51} Here, a review of the record reveals that competent, credible evidence supports the trial court's finding that the detectives provided Carter with the warnings required by Miranda. At the suppression hearing, Detective Metzler testified that prior to asking any questions, he advised Carter of his constitutional rights from an advice of rights card. Detective Metzler then read the contents of that card into evidence. Detective Metzler stated that after hearing his rights, Carter stated that he understood those rights and agreed to speak with Detectives Metzler and Veverka.
 {¶ 52} In spite of the foregoing, Carter argues that Detective Metzler never advised him of his Miranda rights. However, Carter later admitted that he understood his Miranda rights and even asserted those rights when he decided not to make a written statement without the advice of counsel.
 {¶ 53} Under the totality of the circumstances, we conclude that the testimony of Detective Metzler constitutes competent, credible evidence to support the trial court's finding that Carter was read hisMiranda rights. Having been properly advised of his rights, Carter knowingly, intelligently, and voluntarily waived them and willingly provided his oral statement to police.
 {¶ 54} This portion of Carter's fourth assignment of error is overruled. The alleged destruction of potentially exculpatoryevidence.
 {¶ 55} Carter finds error with Detective Metzler's shredding of the handwritten notes taken during his November 29, 2004 interview. At the suppression hearing, Detective Metzler testified that during the interview, both he and Detective Veverka took notes. At the conclusion of the interview, Detective Metzler compiled those notes onto a form 10 typed oral summary of the interview. Detective Metzler stated that he retained his handwritten notes for a few weeks and then shredded them. Detective Metzler stated that it was his practice to shred the notes because of a lack of storage space. Additionally, Detective Metzler stated that he was not aware of any Cleveland Police Department policy regarding retaining notes.
 {¶ 56} Carter claims that the destruction of the notes violated his constitutional rights and requires the dismissal of the felony murder specifications and a reversal of his convictions.
 {¶ 57} In Arizona v. Youngblood (1988), 488 U.S. 51, 109 S.Ct. 333, the United States Supreme Court addressed the issue of whether a criminal defendant is denied due process of law by a state's failure to preserve evidence. The court stated the following:
 "The Due Process Clause of the Fourteenth Amendment, * * *, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the result of which might have exonerated the defendant. * * * We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could -21-form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (Citations omitted.)
 {¶ 58} Therefore, the United States Supreme Court established two tests: one that applies when the evidence is "materially exculpatory" and one that applies when the evidence is "potentially useful." If the state fails to preserve evidence that is materially exculpatory, the defendant's rights have been violated. Id. "However, evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different." State v. Schurlock, Licking County App. No. 05-CA-116;2006-Ohio-4445. "To be materially exculpatory, `evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'"State v. Colby, Portage App. No. 2002-P-0061, 2004-Ohio-343, quotingCalifornia v. Trombetta (1984), 467 U.S. 479, 104 S.Ct. 2528.
 {¶ 59} If, on the other hand, the state fails to preserve evidence that is potentially useful, the defendant's rights have been violated only upon a showing of bad faith. Schurlock, supra. The term bad faith implies something more than bad judgment or negligence; "it imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another." State v. Franklin, Montgomery App. No. 19041, 2002-Ohio-2370.
 {¶ 60} We find that the evidence contained in Detective Metzler's notes is potentially useful, rather than materially exculpatory.
 {¶ 61} Upon a full review of the evidence, we find that Detective Metzler's destruction of his handwritten notes did not constitute bad faith. Detective Metzler testified under oath that he typed the form 10 directly from his handwritten notes, that he did not deviate from those notes, and that he simply transcribed what he wrote. He further stated that he retained his notes for several weeks but then shredded them because of a lack of storage space.
 {¶ 62} Accordingly, we hold that the destruction of the evidence in this matter did not rise to the level of a violation of defendant's right to due process of law. Carter's fourth and final assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
ANN DYKE, A. J., and PATRICIA A. BLACKMON, J., CONCUR
 Appendix Assignments of Error:
 "I. The trial court erred in denying Appellant's motion for acquittalas to the charges when the State failed to present sufficient evidenceto sustain a conviction.
II. Appellant's convictions are against the manifest weight of theevidence.
III. The trial court erred by refusing to instruct the jury on thelesser included offense of involuntary manslaughter which deniedAppellant's right to a fair trial.
IV. The trial court erred by denying Appellant's motion to suppresswhen there is no evidence that Miranda warnings were given prior to theoral statement and Appellant's federal due process rights under theU.S. Constitution and due process rights under the Ohio Constitution wereviolated when the police destroyed potential exculpatory evidence."