[Cite as *State v. Newett*, 2016-Ohio-7605.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 103518

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## DARNELL NEWETT

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-572437-A

**BEFORE:** Laster Mays, J., Boyle, P.J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** November 3, 2016

-i-

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1360 East 9th Street, Suite 600
Cleveland, Ohio 44114


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

By:    Hannah Smith
        Mahmoud Awadallah
        Andrew Rogalski
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

ANITA LASTER MAYS, J.:

{¶1} Defendant-appellant Darnell Newett ("Newett") appeals his convictions of two counts of aggravated murder, murder, felonious assault, aggravated robbery, kidnapping, and tampering with evidence. Newett was sentenced to a total of 35 years to life. After a thorough review of the record, we affirm.

## I.    BACKGROUND

{¶2} Newett was indicted in Cuyahoga C.P. No. CR-13-572437-A on a total of eight counts relating to the death of Rhonda Jackson ("Jackson"). Newett's charges include Count 1, aggravated murder in violation of R.C. 2903.01(A); Count 2, aggravated murder in violation of R.C. 2903.01(B); Count 3, murder in violation of R.C. 2903.02(B); Count 4, felonious assault in violation of R.C. 2903.11(A)(1); Count 5, aggravated robbery in violation of R.C. 2911.01(A)(3); Count 6, aggravated burglary in violation of R.C. 2911.11(A)(1); Count 7, kidnapping in violation of R.C. 2905.01(A)(3); and Count 8, tampering with evidence in violation of R.C. 2921.12(A)(1). On July 20, 2015, the case proceeded to a jury trial. At the close of the state's case and again after the defense's case, the defense moved for a Crim.R. 29 acquittal. The trial court denied the defense's motion each time. The jury found Newett guilty on all counts.

{¶3} Newett was sentenced on August 20, 2015. The trial court merged Counts 1, 2, 3, 4, and 7. The state elected to proceed to sentencing on Count 1, aggravated murder in violation of R.C. 2903.01(A). Newett was sentence to 25 years to life without parole. On Count 5, aggravated robbery, Newett was sentenced to ten years; Count 6, aggravated burglary, ten years; and on Count 8, tampering with evidence, three years to be served concurrently but consecutive to aggravated murder. Newett was sentenced to an aggregate of 35 years to life without parole.

II.     FACTS

{¶4} During the jury trial, the state presented a litany of witnesses. The state's first witness was Jackson's mother, Delores Lacey ("Lacey"). Lacey testified that on a Sunday in March 2013, she was visiting Cleveland from her home in Detroit. She picked Jackson up to assist her in taking care of an ill cousin while she stayed at a hotel. On March 5, 2013, Lacey dropped Jackson off at her home on Clare Avenue around 11:00 a.m. or 11:30 a.m., giving Jackson around $40 or $50. Lacey did not notice anything out of the ordinary. Lacey returned to Detroit. Later that evening, Lacey received a call from the Maple Heights Police Department ("MHPD") informing her that her daughter was murdered. On cross-examination, Lacey testified that Jackson used drugs in the past.

{¶5} Jackson's boyfriend, Michael Boyd ("Boyd"), was the next witness to testify. Boyd had known Jackson for 20 to 25 years. They dated in the past and rekindled their relationship about three years prior to Jackson's death. Boyd testified that he works a regular job, Monday through Friday from 5:30 a.m. to 2:30 pm. Boyd was working

March 5, 2013, as verified by his supervisor Bette Baltakis and his time card. (Tr. 296 and 297.) Boyd testified that Jackson received a monthly disability check between $600 to $800 a month. Jackson's money was received between the first and third of the month. Boyd testified that he and Jackson had a daily routine; each day after work Jackson would call him when she thought that Boyd was near and she would meet him at her side door to go to his home for the evening.

{¶6} On March 5, 2013, Boyd testified that he spoke with Jackson, while at work around 12:30 p.m. When Boyd left work, Jackson did not call him. Boyd called her; she did not answer. Boyd arrived at Jackson's apartment and Jackson was not waiting outside. Boyd thought this was strange and worried something happened. Boyd parked his car, went to the back of Jackson's apartment and noticed her patio door open. Boyd called her cell as he was entering the apartment, heard the cell phone ringing and tripped over Jackson's legs. Boyd felt for a pulse and called 911. Boyd also testified that he met several of Jackson's neighbors in the past and Newett was one of them. Newett lived in the same apartment building about two or three apartments away. Boyd stated that he was aware of Jackson's drug problems.

{¶7} Gloria Watts ("Watts") testified that she and Jackson had been friends for over 20 years. Watts stated that in 2011 at the request of Jackson, she became her payee. Watts remembered that she was starting a new job in March and wanted to give Jackson her money. She recalled giving Jackson around $800 in cash from Jackson's social security check as she usually did at the beginning of the month. (Tr. 412.)

{¶8} William David Nelson ("Nelson"), the building maintenance custodian, who

had been employed at Clare Apartments for 12 years and was also a resident, testified. Nelson was familiar with Jackson and Newett. He testified that Jackson's and Newett's apartments were four apartments from each other on the same floor. Nelson testified that he would see Jackson and Newett congregating in the hallway together and would sometimes go into one another's apartment. Nelson continued by stating that Jackson and Newett were friends and that he had knowledge that the two used drugs together. (Tr. 937 and 938.) On March 5, 2013, Nelson heard Jackson around 11:00 a.m. talking while she was getting her hair done at his neighbor's house. (Tr. 937 and 938.)

{¶9} Nathan Word ("Word") testified that he knew Jackson and Newett from the apartment building. On March 5, 2013, he saw Newett earlier in the day but did not pay much attention to him. However, later in the day Word noticed that Newett had "freshened up." (Tr. 1146.) Word testified that "freshened up" meant that Newett had changed his clothes from what he had on earlier.

{¶10} Schlena Braxton ("Braxton") is the ex-wife of Newett. Braxton testified that Newett loved to cook and that he used knives and other utensils when cooking. (Tr. 805.) She testified that Newett spoke of Jackson because they used drugs together. (Tr. 806.) Braxton stated that Newett informed her that his apartment had been broken into and that he thinks Jackson set him up. Braxton continued to state that Newett was angry and said that he "was going to f**k her up." (Tr. 807 and 808.) Newett's apartment was broken into twice and each time he thought Jackson had set him up. Braxton stated that Jackson knew when Newett was not home because she would call him and Newett would tell Jackson that he was with Braxton. (Tr. 808.) These break-ins happened

around Christmas, 2012, or October or November. (Tr. 809.) Braxton continued to testify that she heard about the murder at Clare Apartments, learned it was Jackson and remembered what Newett had said, and therefore contacted MHPD.

{¶11} Dr. Thomas Gilson ("Dr. Gilson") of the Cuyahoga County Medical Examiner's Office testified regarding Jackson's injuries. Dr. Gilson supervised the autopsy of Jackson on March 6, 2013. Dr. Gilson testified that Jackson's death was from a combination of different types of injuries.

> "There is a component of what we call cervical compression or compression of the neck. There is also a component of what we call sharp force injuries which means there are injuries received with a cutting object, knife, or something that has a sharp blade. Then there are blunt force injuries, as well, which are injuries that are caused by an object that doesn't have a sharp edge. These are more like strikes or blows or things like that. We certify her death as cervical compression and sharp and blunt force injuries of the * * * head and neck, torso, or trunk and her right extremity or right arm."

(Tr. 611 and 612.) Jackson's death was ruled a homicide. Jackson had over 70 stab, slicing, or cutting wounds about her person.

{¶12} Detective Gerald Prusha ("Det. Prusha") testified that he arrived on the scene after hearing a radio call. He stopped at the station to retrieve a camera and gear from the police station. Upon arrival at the Clare Apartments, the crime area was already taped off. It was around 3:00 p.m. on Tuesday, March 5, 2013. Detective Sergeant Bruening ("Sgt. Bruening") had given Det. Prusha the assignment. Det. Prusha ensured that the entire area was secure and began to take pictures of the crime scene. Amongst the items photographed was a comb and footprints. Sgt. Bruening went over to a dumpster because it was in close proximately to the crime scene. Inside the dumpster

was a pile of clothes. (Tr. 1290.) Det. Prusha was called over to photograph and collect any items that could be evidence. Det. Prusha collected a beige shirt, two wallets, a pair of black Cadillac boots, a pair of jeans, a pair of black gloves, and a knife with a broken tip. (Tr. 855.) Det. Prusha removed the jeans and discovered they had what "I suspected to be blood evidence on them." He also discovered a sweatshirt or thermal long-sleeve shirt lying underneath the boots with suspected blood evidence on the cuff of the sleeve. (Tr. 321.) Det. Prusha secured the items and waited for the Bureau of Criminal Investigation ("BCI") to arrive on the scene to process the remaining items. BCI special agents Brenda McNeely ("Agent McNeely") and George Staley ("Agent Staley") arrived on the scene.

{¶13} Agent Staley testified that he completed a report with his analysis of the blood stain patterns. (Tr. 747.) He went on to explain different blood stain patterns and what actions would cause blood to deposit in a certain way. (Tr. 749.) Agent Staley testified that the blood stains on the shirt were consistent with being worn by somebody at the time of the spatter-producing event (tr. 716), as well as the boots. (Tr. 773.) He stated that a violent attack involving a knife could be a spattering- producing event. (Tr. 760.) Agent Staley testified that the blood stains found on the jeans were "consistent with the kneeling on the floor, the knees of the pants had come in contact with the blood source that would have been on the floor." (Tr. 767.)

{¶14} Christine Hammett ("Hammett") is a forensic scientist for BCI. She testified that she examined items of evidence such as blood, semen, or saliva. Hammett stated that she collected samples for DNA analysis and sent them forward. Hammett

testified while examining the jeans discovered in the dumpster, she discovered nine items in the front pockets. Those items consisted of one Ohio ID card, one Medicaid card, one Medicare card, an RTA card, a Humana prescription card, and three business cards. The Medicare and Humana cards had the name Darnell Newett on them. The Ohio ID and RTA cards had the name Darnell Newett, Sr. on them. Hammett then sent the samples collected to Emily Feldenkris ("Feldenkris"), a DNA analyst at BCI. (Tr. 844.)

{¶15} Feldenkris testified regarding the chain of custody and the quality assurance standards of the DNA process. Feldenkris testified that the DNA profile from the interior ankle area of the boots was consistent with Newett being the major contributor and the DNA profile from the swab of the stain of the outside right boot was consistent with Jackson. (Tr. 1061 and 1062.) Feldenkris went on to testify that the DNA profile from the swab of the interior of the jeans was consistent with Newett being the major contributor and the outside minor DNA contributor was consistent with Jackson. Additionally, the blood stain on the front knee area of the jeans was consistent with Jackson. (Tr. 1062.) Feldenkris testified that the swab of the stain on the gray wallet indicated that Jackson's DNA was the main contributor and that Newett's DNA indicated that he was the minor contributor. (Tr. 1062 and 1063.) Boyd had testified earlier that the grey wallet belonged to Jackson. (Tr. 204.) DNA profile of the stain on the outside of the right glove was consistent with Jackson, while the DNA profile of the interior wrist area of the gloves was consistent with Newett. (Tr. 1062 and 1063.) The interior DNA profile of a stain on the left glove was consistent with Jackson and the major DNA profile was consistent with Newett. (Tr. 1064.) There was not enough DNA on the knife to

determine a full DNA profile. (Tr. 1065.)

{¶16} At the conclusion of the state's case, defense counsel requested acquittal of the case via a Crim.R. 29 motion. The trial court denied Newett's motion. Defense counsel called Regina Newett ("Regina"), Newett's sister, to testify. Regina testified that she picked Newett up around 12:30 p.m. to take him to pick up his keys for his new apartment in Lakewood. Regina stated that afterwards they went to eat at Cracker Barrel off SOM Center Road. Regina stated that she dropped Newett off at the Clare Apartments about 5:00 p.m. or 6:00 p.m. (Tr. 1450-1452.) At the conclusion of Newett's case, defense counsel moved for a Crim.R. 29 acquittal. The trial court denied the motion.

{¶17} The case was sent to the jury. The jury found Newett guilty of all charges. Newett was sentenced to 35 years to life without parole. Newett filed this instant appeal.

## II. ASSIGNMENTS OF ERROR

{¶18} Newett proffers four assignments of error:

I. The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(A), on the charge of aggravated murder under R.C. 2903.01(A), and thereafter entering a judgment of conviction of that offense which was not supported by sufficient evidence, in derogation of defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

II. The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(A), on the charge of aggravated murder under R.C. 2903.01(B), and thereafter entering a judgment of conviction of that offense which was not supported by sufficient evidence, in derogation of defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

III. The trial court erred by failing to grant a judgment of acquittal,

pursuant to Crim.R. 29(A), on the charge of aggravated robbery, and thereafter entering a judgment of conviction of that offense which was not supported by sufficient evidence, in derogation of defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

IV.   The trial court erred by entering a conviction for murder which was against the manifest weight of the evidence, in derogation of defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

## III.   LAW AND ANALYSIS

### A.   Crim.R. 29(A) Motion for Acquittal

{¶19}   We will address the first three assignments of error together because Newett challenges the trial court's denial of his Crim.R. 29(A) motion as it relates to two charges of aggravated murder and one count of aggravated robbery.   Crim.R. 29 states,

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

{¶20}   Under Crim.R. 29(A), a trial court "shall not order an entry of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt."   *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus.   A motion for judgment of acquittal under Crim.R. 29 should only be granted where reasonable minds could not fail to find reasonable doubt.   *Id*. at 263, citing *State v. Farraj*, 8th Dist. Cuyahoga No. 89543, 2008-Ohio-1084, ¶ 40.

{¶21} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence.

*State v. Capp*, 8th Dist. Cuyahoga No. 102919, 2016-Ohio-295, ¶ 19. Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense. *Id.* Accordingly, an appellate court reviews a trial court's denial of a defendant's motion for acquittal using the same standard it applies when reviewing a sufficiency of the evidence claim. *Id.*

**{¶22}** When reviewing the sufficiency of the evidence, the appellate court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.* at ¶ 20. When performing a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *Id.*

**{¶23}** Newett argues that the evidence was insufficient to support a conviction for aggravated murder and aggravated robbery. R.C. 2903.01(A) states "[n]o person shall purposely, and with prior calculation and design, cause the death of another * * *." The phrase "prior calculation and design" is not statutorily defined but, instead, has been honed by subsequent case law. After a comprehensive review of legislative history and prior case law, the Ohio Supreme Court determined that, "it is not possible to formulate a bright line test that emphatically distinguishes between the presence or absence of prior calculation and design. Instead each case turns on the particular facts and evidence present at trial." *State v. Taylor*, 78 Ohio St.3d 15, 20, 1997-Ohio-243, 676 N.E.2d 82.

**{¶24}** Prior calculation and design "requires 'more than a few moments of deliberation' and 'a scheme designed to implement the calculated decision to kill.'"

*State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 38, quoting *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph one of the syllabus. "Prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 754 N.E.2d 1129 (2001).

{¶25} "Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves," but "momentary deliberation" is insufficient. Legislative Service Commission Comment to R.C. 2903.01; *see State v. Pierce*, 64 Ohio St.2d 281, 286-287, 414 N.E.2d 1038 (1980). *State v. D'Ambrosio*, 67 Ohio St.3d 185, 196, 616 N.E.2d 909 (1993).

{¶26} Methodologies the state may employ to prove prior calculation and design include proving:

> (1) "evidence of a preconceived plan leading up to the murder"; (2) "evidence of the [defendant's] encounter with the victim, including evidence necessary to infer that the defendant had a preconceived notion to kill regardless of how the [events] unfolded" or (3) "evidence that the murder was executed in such a manner that circumstantially proved the defendant had a preconceived plan to kill," such as where the victim is killed in a cold-blooded, execution-style manner. *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 75, citing *State v. Dunford*, 11th Dist. Ashtabula No. 2009-A-0027, 2010-Ohio-1272, ¶ 53; *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218 (10th Dist.); *State v. Hough*, 8th Dist. Cuyahoga No. 91691, 2010-Ohio-2770, ¶ 19 ("[I]f the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design.").

*State v. Hicks*, 8th Dist. Cuyahoga No. 102206, 2015-Ohio-4978, ¶ 40.

{¶27} Additional factors to be considered are:

(1) Did the accused and the victim know each other, and if so, was that relationship strained?; (2) Did the accused give thought or preparation to choosing the murder weapon or murder site?; and (3) Was the act drawn out or an almost spontaneous eruption of events?

*Taylor*, 78 Ohio St.3d 15, 19, 1997-Ohio-243, 676 N.E.2d 82, ¶ 23; *State v. Shabazz*, 8th Dist. Cuyahoga No. 100021, 2014-Ohio-1828, ¶ 26.

**{¶28}** Considering the *Taylor* factors, Boyd, Nelson, Word, and Braxton testified that Jackson and Newett knew each other. Braxton testified that Jackson's and Newett's relationship was strained. Braxton stated that Newett was angry because he thought Jackson had set him up and his apartment had been burglarized twice. Additionally, Newett told Braxton that he was "going to f**k her [Jackson] up." (Tr. 807 and 808.) Braxton also testified that Newett "loved to cook and used knives when he cooked and I guess other accompanying utensils that he needed for food." (Tr. 805.) This gives credence to the murder weapon being an item such as a knife. Dr. Gilson testified that Jackson's homicide involved "a component of what we call sharp force injuries which means there are injuries received with a cutting object, knife or something that has a sharp blade." (Tr. 611.)

**{¶29}** Finally, Word testified that he saw Newett earlier in the day on March 5, 2013, and when he later saw Newett, Newett had "freshened up," in other words, changed clothes. (Tr. 1146.) Det. Prusha testified that in a nearby dumpster, items were recovered including a pair of black gloves. Feldenkris, the DNA analyst, testified that the blood on the outside of the gloves belonged to Jackson, while the DNA profile of the interior of the gloves belonged to Newett.

(Tr. 1062 and 1063.)   The usage of the gloves goes to prior calculation and design.   Dr. Gilson testified that Jackson's death was the result of a combination of injuries that would be evidence of an act drawn out.   We find that the record supports that Newett gave thought or consideration in choosing the murder weapon and murder site.   Newett knew that Jackson lived alone.   Jackson's murder took place while Boyd was at work and Jackson was at home as she routinely was.   Newett had plenty of time to commit the offense of aggravated murder.   The discovery of blood-stained items in the dumpster and Newett changing clothes supports all the factors of *Taylor*.   Also compelling is the fact that inside the front pockets of the blood-stained jeans were Newett's health and identification cards, further linking Newett to Jackson's homicide.

{¶30} The state has also met its burden on proving aggravated murder under R.C. 2903.01(B) and aggravated robbery.   R.C. 2903.01(B) states,

> [N]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

{¶31}   "A person commits felony murder pursuant to R.C. 2903.02(B) by proximately causing another's death while possessing the mens rea element set forth in the underlying felony offense of violence.   In other words, the predicate offense contains the mens rea element for felony murder." *See State v. Sandoval*, 9th Dist. Lorain No. 07CA009276, 2008-Ohio-4402, ¶ 21, citing *State v. Driggins,* 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 77; *State v. Durham*, 8th Dist. Cuyahoga No. 102654,

2016-Ohio-691, ¶ 151.

{¶32} A person acts purposely when it is his "specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). "Purpose," therefore, depends on an intended result. *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 72, citing *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 79. Intent can be established by circumstantial evidence. *State v. Ratliff*, 8th Dist. Cuyahoga No. 70445, 1997 Ohio App. LEXIS 1957 (May 8, 1997). *See also State v. Nicey*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988). Therefore, intent may be ascertained from the surrounding facts and circumstances in the case. *Ratliff*, *supra*, citing *State v. Carter*, 8th Dist. Cuyahoga No. 87705, 2006-Ohio-6427, ¶ 31.

{¶33} The underlying predicate offense in this case is aggravated robbery. R.C. 2911.01 states,

> [N]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: * * * (3) [i]nflict, or attempt to inflict, serious physical harm on another.

The state demonstrated that Newett in attempting or committing a theft offense, as defined in R.C. 2913.01, or in fleeing immediately after the attempt or offense, inflicted serious physical harm on Jackson. Serious physical harm is defined as "any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement." R.C. 2901.01(A)(5)(d).

{¶34}   The record reveals that Jackson had received approximately $800 from her payee, Watts, and an additional $40 or $50 from her mother, Lacey.   However, there was no evidence of money found in Jackson's home or in her wallet that was discovered in the dumpster.   There is evidence that Newett had come into contact with Jackson's wallet where his DNA was found on her wallet and that wallet was found in the dumpster. This is evidence of the theft offense.   While Newett was committing the theft offense, he inflicted serious physical harm upon Jackson.   The serious physical harm, blunt force trauma, strangulation, and stab wounds, resulted in the death of Jackson.   Newett's jeans were found to have Jackson's blood on its knees with blood splatter.   The testimony regarding the blood splatter revealed that Newett kneeled over Jackson while he beat her. Newett's first, second, and third assignments of error are overruled.

### B. Manifest Weight

{¶35} In Newett's fourth and final assignment of error, he contends that his conviction for murder was against the manifest weight of the evidence. Newett argues that all of the convictions hinge on the idea that Newett was the killer, and the murder conviction was based solely on forensic evidence that was contaminated at the scene of the crime.   We disagree.

{¶36}   In *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively.   *Id.* at 386.   The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but the weight of

the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387.

**{¶37}** In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id*. at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. *Id*. at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

> _* * * [T]his court is mindful that weight of the evidence and the credibility of witnesses are primarily for the trier of fact and a reviewing court must not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the state has proven the offense beyond a reasonable doubt.

*State v. Chavez*, 8th Dist. Cuyahoga No. 99436, 2013-Ohio-4700, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), at paragraphs one and two of the syllabus._

**{¶38}** Further, because the factfinder has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. *State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709 (Aug. 22, 1997).

**{¶39}** A manifest weight inquiry looks at whether the evidence was substantial

enough for a jury to reasonably conclude that all of the elements of the alleged crime have been proved beyond a reasonable doubt. We sit "as a thirteenth juror." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

{¶40} We review the entire record, consider the credibility of the witnesses, weigh the evidence and all reasonable inferences, and determine whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 81. "Weight is not a question of mathematics, but depends on its effect in inducing belief." *Black's Law Dictionary* 1594 (6th Ed.1990). *Thompkins* at 387. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Martin* at 175.

{¶41} The record is replete with evidence supporting Newett's convictions beyond a reasonable doubt. R.C. 2911.11, aggravated burglary, states,

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

R.C. 2903.11, felonious assault, states,

(A) No person shall knowingly do either of the following:

(1) Cause serious physical harm to another or to another's unborn;

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

R.C. 2905.01, kidnapping, states,

(A) No person, by force, threat, or deception, * * * , or by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(3) To terrorize, or to inflict serious physical harm on the victim or another.

R.C. 2921.12, tampering with evidence, states,

(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation * * *.

{¶42} The evidence shows that Jackson and Newett were friends. Newett believed that Jackson had his home broken into on two occasions. Newett vowed to get revenge. It was the first of the month when Jackson received her social security check. Jackson had approximately $850 in her wallet. Jackson's apartment was entered and/or exited through her rear patio door. Jackson was forced to remain in her apartment and was murdered there. Jackson's wallet was found in the dumpster near her apartment with Newett's DNA on it. Several items including boots, a sweatshirt,

jeans, and gloves linked to Jackson's murder were discovered in a nearby dumpster. This was an attempt to get rid of the items. Newett's clothes and gloves containing Jackson's blood were found in the dumpster. Newett changed his clothes and went back around other neighbors. Finally, government health and identification cards were found in Newett's jeans that were located in the dumpster near Jackson's apartment.

**{¶43}** Therefore, witness testimony, circumstantial evidence, and forensic evidence provided sufficient evidence to prove beyond a reasonable doubt that Newett was guilty. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 227. The aggravated murder, murder, felonious assault, kidnapping, aggravated burglary, and tampering with evidence convictions were not against the manifest weight of the evidence.

**{¶44}** We reject Newett's contention that the forensic items were fatally compromised because at least 15 police officers rummaged through Jackson's apartment and yard. We also reject Newett's contention that Agent Staley changed gloves when he could and not every time he collected a piece of evidence, and the lack of hair nets and booties could have contaminated the evidence. (Tr. 792 and 793.)

**{¶45}** The cross-examination of Agent Staley went as follows,

[STATE]:     Agent Staley, when you and Agent McNeely responded to the crime scene and investigated the crime scene, to the best of your training and experience, did you and Agent McNeely follow proper protocol?

[STALEY]:    Yes.

[STATE]:     Any time that anyone goes into a crime scene, is it ever possible to 100 percent eliminate all possible

contamination?

[STALEY]: No.

[STATE]: Or cross-contamination?

[STALEY]: No.

[STATE]: What is your goal regarding contamination?

[STALEY]: To follow our policies and procedures and do the best job that I can.

[STATE]: Is it your goal to minimize it?

[STALEY]: Yes.

* * *

[STATE]: A mask every time you go into a crime scene?

[STALEY]: No sir.

(Tr. 794.)

* * *

[STATE]: Having had the opportunity to go through that scene and work that scene, what do you think about characterizing that as a cesspool of contamination?

[STALEY]: Well, it was contaminated from other people. I mean, it was not a clean environment to begin with.

[STATE]: I mean regarding the actions of the responding investigative agents from BCI, BCI's contribution to the contamination?

[STALEY]: We used our personal protective equipment to the best of its ability to reduce any contamination or cross-contamination.

(Tr. 800.)

**{¶46}** Agent Staley testified that his goal was to follow procedures and to minimize contamination. The jury heard Agent Staley's testimony and additional testimony regarding data collection, chain of custody, and DNA analysis. Nevertheless,

> "'[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.'"

*State v. Ross*, 2d Dist. Montgomery No. 22096, 2008-Ohio-1760, ¶ 18, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709 (Aug. 22, 1997).

**{¶47}** "Only in exceptional circumstances should a judgment be reversed as being against the manifest weight of the evidence." *Id.*, citing *State v. Parker*, 2d Dist. Montgomery No. 18926, 2002-Ohio-3920, ¶ 70, citing *State v. Molen*, 2d Dist. Montgomery No. 21941, 2008-Ohio-6237, ¶ 16-17. We find that this is not that exceptional case.

**{¶48}** Finally, we also reject Newett's idea that MHPD did not consider anyone else for the homicide of Jackson, when they did not investigate another individual that was known to have threatened Jackson. (Tr. 1356.) Defense counsel questioned Sgt. Bruening regarding this accusation. Sgt. Bruening testified as follows,

[COUNSEL]: Well, Michael Boyd tells you that in the days leading up to the murder, Michael Bourn, Big Mike had been calling Rhonda threatening her regularly. You heard the testimony?

[SGT. BRUENING]: Yes, I did.

[COUNSEL]: Then you hear the testimony from Michael Bourn saying I didn't call that woman at all. They can't both be true, can they?

| [SGT. BRUENING]: | No, they cannot. |
|---|---|
| [COUNSEL]: | So you trusted Michael Boyd and you went and talked to Michael Bourn or someone went and talked to Michael Bourn, correct? |
| [SGT. BRUENING]: | Correct. |
| [COUNSEL]: | And it was determined that he was at Harbor Light on the day in question? |
| [SGT. BRUENING]: | That was the information we had. |

(Tr. 1357 and 1358.)

{¶49} Defense counsel questioned Det. Bruening regarding additional theories and possible suspects for the murder of Jackson. The record reveals that MHPD received information regarding Michael Bourn threatening Jackson over an undetermined period of time before her murder. MHPD did not retrieve buccal swabs, obtain a DNA standard from Michael Bourn (tr. 156), or subpoena Jackson's phone records. (Tr. 1359.) The record reveals that the lead detective passed away right before the trial began (tr. 1387), and Det. Bruening was unable to testify to the extent of a follow-up investigation. The record reveals that defense counsel adequately placed all theories into evidence. The trier of fact was in the best position to weigh the evidence and the witnesses' credibility. A trier of fact may believe or disbelieve all, part, or none of a witnesses' testimony. *State v. Brown*, 8th Dist. Cuyahoga No. 98881, 2013-Ohio-2690, ¶ 39. Accordingly, any theory regarding another suspect in the murder of Jackson is to be weighed by the trier of fact.

{¶50} In light of our review of the record, we find that the trial court did not lose its way or create a manifest miscarriage of justice. *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541. We find that the record contains substantial credible evidence that supports Newett's conviction for murder. As a result, Newett's conviction for murder is not against the manifest weight of the evidence. This is not one of those rare cases where the evidence presented weighs heavily against conviction. *State v. Hudson*, 7th Dist. Mahoning No. 09 MA 89, 2011-Ohio-1343, ¶ 49. Newett's fourth assignment of error is overruled.

{¶51} The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

MARY J. BOYLE, P.J., and
PATRICIA ANN BLACKMON, J., CONCUR

.