[Cite as *State v. Alexander*, 2017-Ohio-1445.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 104281**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## JAMES ALEXANDER

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-598675-B

**BEFORE:** Laster Mays, J., E.T. Gallagher, P.J., Blackmon, J.

**RELEASED AND JOURNALIZED:** April 20, 2017

-i-

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
820 West Superior Avenue, Suite 800
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Anna M. Faraglia
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

ANITA LASTER MAYS, J.:

{¶1} Defendant-appellant, James Alexander ("Alexander"), convicted of 15 criminal counts and sentenced to 59 years-to-life, asks this court to "vacate and/or reverse his convictions and/or remand this case for a new trial and/or vacate his sentence." We affirm the trial court findings.

## I.    Background and Facts

### A.    Background

{¶2} Alexander, who is 19 years old, and his codefendant, Willie Wilson ("Wilson"), 21 years old, were indicted for the shooting death of Miyazhane Vance ("Vance"), 19 years old, and the shooting of Vance's brother, Brandon Fisher ("Fisher"), 17 years old. They were also charged with attempted criminal acts against Vance's two children:[1]

| | |
|---|---|
| Counts 1 and 2: | Aggravated murder (Vance), a first-degree felony, in violation of R.C. 2903.01(A), with one- and three-year firearm specifications R.C. 2941.141(A) and 2941.145(A); |
| Count 3: | Aggravated burglary (Vance and/or Fisher), a first-degree felony, in violation of R.C. 2911.11(A)(1); |
| Count 4: | Kidnapping (Vance), a first-degree felony, in violation of R.C. 2905.01(A)(4); |

---

[1] Wilson was also charged with Counts 16 and 17, having weapons while under disability, R.C. 2923.13(A)(1) and (2).

| | |
|---|---|
| Count 5: | Murder (Vance), a first-degree felony, in violation of R.C. 2903.02(B), with one- and three-year firearm specifications; |
| Counts 6 and 7: | Felonious assault (Vance), a second-degree felony, in violation of R.C. 2903.11(A)(1), with one- and three-year firearm specifications; |
| Count 8: | Attempted murder (Fisher), a first-degree felony, in violation of R.C. 2903.02(A), with one- and three-year firearm specifications; and |
| Counts 9 and 10: | Felonious assault (Fisher), a second-degree felony, in violation of R.C. 2903.11(A)(1) and (2), with one- and three-year firearm specifications; |
| Count 11: | Kidnapping (Fisher), a first-degree felony, in violation of R.C. 2905.01(A)(3), with one- and three-year firearm specifications; |
| Count 12: | Attempted murder (A.W.), a first-degree felony, in violation of R.C. 2923.01 and 2903.02(A), with one- and three-year firearm specifications; |
| Count 13: | Felonious assault (A.W.), a second-degree felony, in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications; |
| Count 14 : | Attempted murder (Z.W.), a first-degree felony, in violation of R.C. 2923.01 and 2903.02(A), with one- and three-year firearm specifications ; |
| Count 15 : | Felonious assault (Z.W.), a second-degree felony, in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications * * *. |

{¶3} Wilson and Alexander pled not guilty. The trial court denied a motion in limine regarding cell phone tower records, and to sever the cases for trial. The state called 25 witnesses and introduced a number of exhibits. There

were no defense witnesses introduced, but six defense exhibits, and one joint exhibit was presented. The trial court denied the defendants' Crim.R. 29 motion.

{¶4} A jury found Wilson and Alexander guilty on all counts. On March 15, 2016, Alexander was sentenced to 56 years to life with five years of postrelease control; 30 years to life on the aggravated murder charge, 11 years on the aggravated burglary charge, 22 years on the attempted murder charges, and three-year firearm specifications. Based on the seriousness of the crime and facts and circumstances of the case, the trial court determined that the sentences would run consecutively. The trial court imposed court costs and advised Alexander that an affidavit of indigency must be filed before the sentencing.

**B.      The Trial**

{¶5} Vance and her two children resided in a small apartment located on East 99th Street in Cleveland, Ohio. Vance's childhood friend, Donella Atwater ("Atwater") often stayed at Vance's apartment. Fisher moved in with Vance after their mother, Sharonda Woodland ("Woodland"), relinquished custody of Fisher to the Department of Children's and Family Services for being unruly.

{¶6} Fisher, Wilson, Alexander, and Leon Ross ("Ross") were involved with stealing cars and selling drugs. They also carried pistols and revolvers that they obtained by stealing or purchasing. Fisher, Deshaun Moore ("Moore"), Ross, Alexander, and Wilson would hang out at the store, park, or Vance's apartment, drinking alcohol, and smoking marijuana, and cigarettes on a regular basis. Fisher carried a .38

caliber revolver and a .9-millimeter handgun. Wilson carried a .9-millimeter, and Ross carried a .38 Taurus revolver. The group contacted each other by telephone or through Facebook.[2]

{¶7} Fisher testified to his membership in the 93rd Street Boys gang,[3] and Ross's affiliation with the Heartless Felons. Ross was a good friend of Fisher's, but not of Wilson or Alexander.

{¶8} Wilson began dating Vance in December 2014 and often stayed overnight. Vance gave Wilson a key to the apartment. Fisher, who was at the apartment frequently, was not provided with a key.

{¶9} Fisher stopped hanging out with Wilson in March of 2015 because, Wilson, "started acting crazy. * * * He was trying to get me to do stuff that I didn't want to do." Fisher saw Wilson "now and then" and Alexander even less often. Vance and Wilson were having relationship problems though Wilson continued to come to the apartment. One evening Fisher, Wilson, Ross, and Alexander were riding on the rapid transit, and Wilson was holding Ross's .357 caliber gun that Ross handed to Wilson prior to boarding the train. They had been drinking, fell asleep, and awakened to find that Wilson was gone, as well as Ross's gun. Fisher advised Ross to "leave it alone."

---

[2] The Facebook names were KingWill Da Shooter (Wilson), AlleyBoyYoung (Alexander) and Ross used his given name. Moore's Facebook name is not in the record. Fisher changed his name from Jesuson93rd to BeenBout Da Bandzz after the shooting.

[3] Dereion Jackson ("Jackson"), sister of Vance and Fisher, testified that Fisher was kicked out of the gang for testifying.

**{¶10}** Shortly after that, about a week prior to the shootings, Vance, Fisher, and Ross went to the home of another young woman to retrieve her apartment keys from Wilson. Vance became angry when the woman's mother said that Wilson was not there and threw rocks at the window. Ross kicked the door open, but everyone left when the woman's mother threatened to call the police.

**{¶11}** Wilson called Fisher via Facebook and told him that he "heard niggas was looking for me." Ross grabbed the phone and asked Wilson about his .357 gun. Wilson told him he had his own gun, "a 40." Fisher could also hear Alexander on the phone with Wilson. Fisher told Wilson that he only needed the keys. Alexander responded that Fisher should not go around "kicking doors like I'm tough." Wilson and Alexander then hung up.

**{¶12}** On April 13, 2014, Fisher and Ross drove a stolen van to a candlelight vigil in Euclid, Ohio for a childhood friend. The police ended the vigil when fights broke out, and later chased Fisher and Ross in the stolen van. Fisher jumped out and walked to his sister's apartment, arriving about 12:30 a.m. His sister, Atwater, and the children were there. Fisher left again to engage in a fruitless search for Ross, stopped at the store and returned to the apartment about 2:00 a.m.

**{¶13}** Vance was in the bedroom with the children and Atwater was in the other bedroom. Both doors were closed. Fisher laid on the floor with a blanket, and pillow near the front door where he could plug in his laptop. At approximately 2:45 a.m., Fisher heard keys, the door opened, Wilson and Alexander stepped over him into the

kitchen area of the combined kitchen and   living room.   Wilson sat down in a chair in front of the kitchen table with his hand in his pocket.   Alexander was standing next to him, holding a .357, the gun that Fisher stated Wilson had taken from Ross.

{¶14} Alexander told Fisher "I heard you wanted to bust me — he heard I wanted to shoot him and take his gun."   Alexander then looked at Wilson who began firing. Fisher curled up on the floor and covered his head with his arms.   Wilson shot him twice, and Alexander shot him in the back of the neck.   Fisher saw them walk toward Vance's room and heard shots as he faded in and out of consciousness.   As he attempted to get up again, Wilson shot him two more times in the right side of his face.[4]   Fisher crawled into the hallway attempting to obtain assistance from neighbors.   He did not see Wilson and Alexander leave.

{¶15}   Fisher sustained significant injuries, and was placed in a medically induced coma for three days, hospitalized for three months and entered rehabilitation to regain life skills.   Fisher has a permanent stent to maintain blood flood in his neck, suffers from double vision and is deaf in one ear.

{¶16} The police interviewed Fisher the day he emerged from the coma. Fisher told the police that Wilson and Alexander entered the apartment and that Wilson shot him.   Fisher indicated that Wilson lied to Alexander to induce him to commit the shooting, and that Wilson had previously asked Fisher to conspire with him to kill Alexander, information he had shared with the state.   Fisher explained that Wilson wanted to kill Alexander because Wilson wanted Ross's gun.

{¶17}   Vance's long-time friend Atwater testified that she was in the second bedroom at Vance's apartment at the time of the shooting.   Atwater moved in with

---

[4]   Alexander argues that Fisher deviated in his statements from saying that only Wilson shot him to saying Wilson and Alexander shot him, as discussed later in this opinion.

Vance temporarily at the beginning of April 2014. Fisher was also staying there at the time, and Ross was there often. Fisher and Ross slept on the floor in the carpeted area of the kitchen and living room area.

{¶18} Atwater and Vance were in their respective sleeping rooms when Atwater heard an unfamiliar voice in the house asking Fisher questions, and a second unfamiliar voice who spoke infrequently. The voices were not raised. She heard three shots and Fisher called his sister's name. Atwater heard four more shots, screamed and heard people running toward the back of the apartment building and the back door slam.

{¶19} Atwater walked into the room and saw Fisher laying in a fetal position in a pool of blood. She attempted to awaken Vance whose son was sleeping beside her. Vance had been shot in the head. Atwater checked on both children, called 911, ran to ask the neighbor for assistance, and called Woodland. Atwater made statements to officers and detectives.

{¶20} Vance's neighbor Terrance Harris testified that he heard the shots, opened the door to find Atwater visibly upset and saw Fisher crawling on the floor. He took Atwater's phone, called 911, and remained in his apartment. Vance's other neighbor Catherine Washington ("Washington") also heard the shots and the back door slam. She testified the outer back door lock was broken. Washington heard light tapping at the base of her door and saw a young man lying there in a pool of blood.

{¶21} Officers and paramedics ("EMS") arrived to secure the scene and transport the injured. Woodland and her younger son also arrived. Medical testimony

was elicited from emergency room personnel and attending physicians as to the injuries to Vance and Fisher. The deputy medical examiner, Dr. Andrea McCollum ("Dr. McCollum") testified that Vance sustained nine gunshot wounds to the head, trunk, and extremities.

{¶22} Detective Kathleen Carlin ("Detective Carlin"), a ten year homicide detective with 27 years of law enforcement experience, testified there was no sign of force entry. When Fisher emerged from the medically induced coma, he told Detective Carlin he was shot by "Willie and James." Detective Carlin interviewed Alexander at the homicide unit's headquarters with his mother and an attorney on April 29, 2016. Alexander said he "heard" about the shootings, and identified an alibi witness.

{¶23} Alexander was released and on May 18, 2015, arrested based on a warrant requested by Detective Carlin, founded primarily due to Fisher's statements and the corroboration of the physical evidence. Detective Carlin stated that Fisher consistently identified Wilson and Alexander as his shooters during at least three interviews with police. Fisher told the police during his statements that he thought that one gun was a semiautomatic, maybe a .40 caliber, but turned out to be a .9-millimeter semiautomatic. The other gun was a .357. At the time of Alexander's arrest, officers told Alexander that he was being arrested for an outstanding warrant. Alexander "blurted out" that, "I didn't do the shooting. I only watched it, but they didn't want to hear that last time."

{¶24} Ballistics expert James Kooser ("Kooser") recovered seven .9- millimeter bullet casings that he determined were fired by the same weapon, three additional casings

that could have been from the same weapon, and one casing was too damaged to assess. Testimony confirmed that a .357 does not leave spent shell casings. Additional forensic evidence provided information about the distances between the guns and the victims at the time of the shootings, bullet holes, and gun residue.

**{¶25}** Detective Al Johnson ("Detective Johnson") testified over defense objections based on Crim.R. 16(K), that the defense had not been provided with a copy of Detective Johnson's expert report. Detective Johnson was offered to testify about his gang unit experiences and share his personal knowledge about the "beef" between the Heartless Felons and 93rd Street Boys in light of the testimony regarding the possible membership of Alexander, Wilson, and Fisher in one of those gangs. The state argued that Detective Johnson was not offered as an expert, but as an individual with "specialized knowledge about street gangs within the city of Cleveland" who could provide "insight."

**{¶26}** Counsel for Wilson met with Detective Johnson prior to his trial testimony the next morning. Alexander's counsel maintained that the testimony was simply expert testimony under Evid.R. 702, labeled as "specialized testimony." In light of defenses inferences that the shooting could have been the result of a dispute between gangs, the trial court allowed the testimony with parameters that no information about participants in the current case be introduced or solicited.

**{¶27}** Detective Johnson testified about Cleveland gangs, their organizational structure, membership requirements, rules, and penalties for violating the rules. He also

demonstrated the symbolic gang hand signs, tattoos, and discussed the animosity between certain groups. Detective Johnson confirmed that his testimony was not related to the defendants and the current incident. He did confirm that his unit was initially called to the crime scene and made broad inquiries but did not find out anything about what transpired.

{¶28} The jury found Alexander guilty on all counts. The total sentence was 56 years to life, as the trial court determined the sentences should run consecutively due to the seriousness of the crimes. Alexander appeals.

## II.     Assignments of Error

{¶29} Alexander presents seven assignments of error.

> I.      The trial court erred by failing to grant a judgment of acquittal pursuant to Crim.R. 29(A), on the charges, and thereafter entering a judgment of conviction of that offense as those charges were not supported by sufficient evidence, in violation of defendant's right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution.

> II.     Appellant's convictions are against the manifest weight of the evidence.

> III.    The trial court erred by denying appellant's motion for a separate trial from that of his codefendant.

> IV.     Appellant was denied a fair trial by the witness's improper comments while testifying.

> V.      The trial court erred when it admitted other acts testimony in violation of R.C. 2945.59, Evid.R. 404(B) and Appellant's rights under Article I, Section 10 of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution.

VI. The trial court erred by ordering appellant to serve a consecutive sentence without making the appropriate findings required by R.C. 2929.14 and H.B. 86.

VII. The Court costs imposed at the sentencing hearing infringes upon appellant's rights under the Eighth and Fourteenth Amendments to the United States Constitution, R.C. 2929.18, 2929.19(B)(5), 2947.14, and related sections of the Ohio Constitution.

## III. Law and Analysis

### A. Sufficiency of the Evidence, Motion for Judgment of Acquittal

**{¶30}** We first address Alexander's challenge to the sufficiency of the evidence as a matter of law, and the denial of Alexander's motion for judgment of acquittal pursuant to Crim.R. 29. We find these errors to be without merit.

**{¶31}** Crim.R. 29(A) provides:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

**{¶32}** Under Crim.R. 29(A), a trial court "shall not order an entry of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus. A Crim.R. 29 motion for judgment of acquittal should only be granted where reasonable minds could not fail to find reasonable doubt. *Id.* at 263, citing *State v. Farraj*, 8th Dist. Cuyahoga No. 89543, 2008-Ohio-1084, ¶ 40.

**{¶33}** A motion for acquittal under Crim.R. 29(A) tests the sufficiency of the evidence. *State v. Capp*, 8th Dist. Cuyahoga No. 102919, ¶ 19. A trial court must issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense. *Id.* An appellate court is charged with reviewing a trial court's denial of a motion for acquittal by employing the same standard it applies when reviewing a sufficiency of the evidence claim. *Id.*

**{¶34}** When performing a sufficiency inquiry, we do not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *I*d. at ¶ 20. We determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*

**{¶35}** Alexander argues that there is no physical evidence supporting that he committed any of the crimes in this case, though expert ballistic testimony established that revolvers, such as the .357 Alexander possessed, does not eject spent casings. At the time of his arrest, Alexander voluntarily stated that, "I didn't do the shooting. I only watched it, but they didn't want to hear that last time." Fisher's testimony is the only evidence that Alexander shot him, and that testimony, Alexander argues, was inconsistent.

**{¶36}** Fisher testified that Wilson and Alexander used the key to enter the apartment, stepped over him, walked past him and turned toward him. Alexander was

pointing a gun at him and Wilson's hand was in his pocket. Alexander said, "I heard you wanted to bust me — he heard I wanted to shoot him and take his gun."

Q.   Okay.   What did you say?

A.   I didn't get a chance to say anything.

Q.   What happened?

A.   I looked over at Willie and he started firing.

Q.   Okay.   Who fired at you first?

A.   Willie.

Q.   Okay.   Could you see the person who fired at you?

A.   I just like balled up (indicating).

Q.   Okay.   When you say you balled up, what did you do with your arms?

A.   I threw them around my head.

Q.   Okay.   How many times did he shoot at you?

A.   He shot me twice in the arm, and then James shot me in the back of the neck.

Q.   Okay.   And once they did that, what do you remember, sir?

A.   I remember them walking towards my [sister's] room, hearing shots, and I passed out, but I came back to, but I was just — I kept coming in and out.

Q.   Okay.   Did you see them walking towards your sister's bedroom?

A.   Yes.

Q.   Did they both walk towards your sister's bedroom?

A.     Yes.

Q.     Could you see who walked first?

A.     Willie.

Q.     And who walked after Willie?

A.     James.

Q.     And what happened to you at that point?

A.     At that point when I gained a little bit of consciousness, you know what I mean, I tried to get up, and then Willie had came back and he shot me two more times in the right side of my face until I blacked out again.   Then I came to.   I got up, grabbed the door, but I fell back down, so I just crawled to the end of the hallway trying to knock on the door, but I was too weak, because I was losing so much blood, so I ended up just laying there.

Q.     Okay.   And did you see them leave?

A.     No.

Q.     When you came to, was the door to the apartment open or closed?

A.     Open.   Wait.   You talking about when I came back to inside the apartment or in the hallway when I came back to?

Q.     Before you crawled out in the hallway —

A.     It was closed.

Q.     Okay.   So did you see Willie Wilson or James Alexander leave the apartment?

A.     No.   When Willie shot me two more times, I blacked out again.

Q.     Okay.   And when he shot you two more times, were you moving before he shot you?

A.     Yes.

Q.      So at that point you black out?

A.      Yeah.   I passed out.

Q.      All right.   What is the next thing you hear or you see or you try to do?

A.      The next thing I did was I managed to get up and grab the door and open it, and I fell again and I crawled in the hallway to the end of the hallway and just tried to knock on somebody door.

(Tr. 1532-1535.)[5]

**{¶37}** We further observe that Alexander was also charged with complicity in this case.   R.C. 2923.03:

(A)   No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1)   Solicit or procure another to commit the offense;

(2)   Aid or abet another in committing the offense;

(3)   Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

(4)   Cause an innocent or irresponsible person to commit the offense.

(B)   It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.

(C)   No person shall be convicted of complicity under this section unless an offense is actually committed, but a person may be convicted of complicity in an attempt to commit an offense in violation of section

---

[5] Alexander argues that Fisher deviated in his statements from saying that only Wilson shot him to saying Wilson and Alexander shot him. That does not; however, overcome the   complicity status.

2923.02 of the Revised Code.

Not only does Fisher's testimony establish Alexander's acts and complicity, Alexander admitted to officers upon his arrest that he was present during the shootings.

{¶38} Viewed in a light most favorable to the state, we find that a "rational trier of fact could have found the essential elements of the crime[s] proven beyond a reasonable doubt." *State v. Leonard*, 104 Ohio St.3d 54, 67, 2004-Ohio-6235, 818 N.E.2d 229, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (2000), paragraph two of the syllabus. We affirm the trial court's denial of Alexander's Crim.R. 29(A) motion for judgment of acquittal. The assignment of error is not well-taken.

### B. Manifest Weight

{¶39} We next review Alexander's claim that his convictions are against the manifest weight of the evidence. There is a quantitative and qualitative difference between the manifest weight and sufficiency of the evidence. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. While sufficiency is a test of the legal adequacy of the evidence to support a verdict, a manifest weight determination analyzes the existence of a "greater amount of credible evidence" supporting the issue to be established.

{¶40} "Weight is not a question of mathematics, but depends on its effect in inducing belief." *Id.* at 387.

> In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed

and a new trial ordered." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541*,* quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983).

*State v. Leonard*, 104 Ohio St.3d 54, 68, 2004-Ohio-6235, 818 N.E.2d 229.

{¶41} We also give deference to the factfinder:

[B]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. *State v. Robinson*, 8th Dist. Cuyahoga No. 99290, 2013-Ohio-4375, citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709 (Aug. 22, 1997).

*State v. Newett,* 8th Dist. Cuyahoga No. 103518, 2016-Ohio-7605, ¶ 38. *See also C. E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978). "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."

{¶42} We thus look to determine whether, the case before us presents the "'exceptional case in which the evidence weights heavily against conviction.'" *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717; *Newett,* 8th Dist. Cuyahoga No. 103518, 2016-Ohio-7605, ¶ 47, citing *State v. Ross*, 2d Dist. Montgomery No. 22096, 2008-Ohio-1760, ¶ 18, quoting *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709 (Aug. 22, 1997).

**{¶43}** Our analysis of the first assigned error is equally applicable here. Alexander's detailed account of Fisher's history of criminal activities does not outweigh or refute the evidence of Alexander's guilt in this case. We also reject Alexander's argument here that he was prejudiced by the testimony of Detective Johnson regarding his experience with gang activity. Detective Johnson explained to the jury that the testimony was not offered as to either defendant, but provided an overview of gang culture, a topic also addressed during Fisher's testimony regarding the gang affiliations of Fisher, Ross, Wilson, and Alexander, and criminal activities of the group.

**{¶44}** We do not find that the jury lost its way. *Leonard*, 104 Ohio St.3d 54, 68, 2004-Ohio-6235, 818 N.E.2d 229. The second assigned error is overruled.

### C. Severance

**{¶45}** Alexander's third challenge is to the denial of his motion to sever. Civ.R. 8(B) allows joinder of criminal defendants involved in the same acts or transactions, while Civ.R. 14 mandates severance where joinder prejudices a defendant.

> "The law favors joining multiple criminal offenses together in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990). A defendant requesting severance "has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). A defendant claiming error in the denial of severance must affirmatively show that his rights were prejudiced and that the trial court abused its discretion in refusing separate trials. Id.
>
> "Where evidence of each of the joined offenses would be admissible at separate trials, severance is not required because prejudice due to the cumulation of evidence or the inference of a criminal disposition is largely

absent." *State v. Hamblin*, 37 Ohio St.3d 153, 159, 524 N.E.2d 476 (1988).

*State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 69-70.

**{¶46}** Alexander argues that the evidence against Wilson "spilled over to him," that the evidence involving Wilson had nothing to do with Alexander. The record does not support Alexander's argument.

**{¶47}** The state offers that the evidence Alexander complains of regarding Wilson and Fisher's gang memberships, photographs of them holding guns, information about Wilson's relationship with Vance, were offered to support the relationship of the parties and Fisher's identification of Wilson and Alexander as the culprits. Evidence offered also supports the method of access to the apartment where Alexander stated to police that he was present, but was not shooting.

**{¶48}** We do not find that Alexander was prejudiced by the denial of severance. "[T]he evidence is direct and uncomplicated and could be reasonably separated as to each offense." *State v. Elam*, 8th Dist. Cuyahoga No. 103122, 2016-Ohio-5619, ¶ 66, quoting *State v. Sutton*, 8th Dist. Cuyahoga Nos. 102300 and 102302, 2015-Ohio-4074, ¶ 22. We find that the joinder was not prejudicial. The third assigned error is overruled.

### D. Witness' Improper Comments While Testifying

**{¶49}** For the fourth assigned error, Alexander argues he was prejudiced by testimony by Detective Carlin elicited by counsel for Wilson and the state. Detective Carlin stated that Fisher had been consistent throughout his statements and the trial regarding certain facts:

The facts, the circumstances surrounding the crime scene, the information provided by Brandon [Fisher] all matched up to how the events occurred, including the animosity between Miyazhane Vance and Willie Wilson and Brandon [Fisher] and Willie Wilson and James Alexander.

(Tr. 2414.) The transcript reflects that the cited testimony occurred at the conclusion of ongoing questions by defense counsel regarding what portions of Fisher's statements Detective Carlin found to be consistent, and as she explained why she did not conduct an investigation of Fisher to ascertain "what type of witness she had."

{¶50} We recently observed on this issue:

It is reversible error to admit testimony from a purported expert or lay witness attesting to the believability of another's statements. *State v. Boston*, 46 Ohio St.3d 108, 128, 545 N.E.2d 1220 (1989). "[I]n our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses." *State v. Pizzillo*, 7th Dist. Carroll No. 746, 2002-Ohio-446, 2002 Ohio App. LEXIS 162, 15 (Jan. 17, 2002), citing *Boston* at 129.

*State v. Daniel*, 2016-Ohio-5231, 57 N.E.3d 1203, ¶ 48 (8th Dist.). The rule also extends to police. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31 (police officer's testimony that accused was being "very deceptive" was erroneously admitted).

{¶51} We find, however, that to the extent Detective Carlin's statements may be deemed to be an opinion, the error was harmless because it did not affect a substantial right. *State v. Lytle,* 48 Ohio St.2d 391, 403, 358 N.E.2d 623 (1976). "Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal." *State v. Allen,* 8th Dist.

Cuyahoga No. 92482, 2010-Ohio-9, ¶ 51, citing *State v. Brown*, 65 Ohio St.3d 483, 485, 1992-Ohio-61, 605 N.E.2d 46.

**{¶52}** We find that, viewing the entire record, Detective Carlin's statement that she found Fisher's statements to be consistent on certain facts was harmless error and did not change the outcome of the case. *Id.* The fourth assignment of error is overruled.

### E. Admission of Other Acts

**{¶53}** The fifth assigned error concerns the trial court's admission of the testimony of Detective Johnson of the Gang Impact Unit in violation of R.C. 2945.59 and Evid.R. 404(B).

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

R.C. 2945.59

**{¶54}** Evid.R. 404(B) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**{¶55}** We consider whether the trial court abused its discretion on this issue, a standard requiring "more than an error of law or judgment." *State v. Adams,* 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). It "[i]mplies that the court's attitude is unreasonable, arbitrary, or unconscionable." *Id.* at 157-158, citing *Steiner v. Custer*, 137 Ohio St. 448, 31 N.E.2d 855 (1940); *Conner v. Conner*, 170 Ohio St. 85, 162 N.E.2d 852 (1959); *Chester Twp. v. Geauga Co. Budget Comm.,* 48 Ohio St.2d 372, 358 N.E.2d 610 (1976).

**{¶56}** Detective Johnson testified about gang activity, membership, and conduct. The state argues that the information regarding gangs was offered to refute the theory of the defense, broached during Fisher's cross-examination, that Fisher's shooting was related to Fisher's gang membership and a war between the Heartless Felons and the 93rd Street Boys.

**{¶57}** There was no testimony offered by Detective Johnson regarding the defendants or the alleged crimes. We do not construe Detective Johnson's testimony to fall within the realm of R.C. 2945.59 and Evid.R. 404(B). The fifth assigned error is overruled.

**F.    Consecutive Sentence Finding**

**{¶58}** Moving on to the sixth assigned error, Alexander argues that the trial court failed to make the appropriate findings in imposing consecutive sentences pursuant to R.C. 2929.14 and H.B. 86.

**{¶59}** R.C. 2929.14(C)(4) provides:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a)     The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under postrelease control for a prior offense.

(b)     At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c)     The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶60}** A trial court imposing consecutive sentences,

[M]ust state the required findings as part of the sentencing hearing, and by doing so it affords notice to the offender and to defense counsel. *See* Crim.R. 32(A)(4).   And because a court speaks through its journal, *State v. Brooke*, 113 Ohio St.3d 199, 2007-Ohio-1533, 863 N.E.2d 1024, ¶ 47, the court should also incorporate its statutory findings into the sentencing entry.
  However, a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld.

*State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 29.

**{¶61}** The trial court stated:

COURT:     All right.   The court has considered all this information, the principles   and      purposes   of   felony   sentencing,   the

appropriate recidivism and seriousness factors. Pursuant to statutory requirements, there is mandatory consecutive sentencing with respect to the firearm specifications. And then the court is left with some discretion with respect to consecutive prison terms.

The court has considered all these facts. I sat through the trial. I considered everything. I am going to find that consecutive sentences are appropriate, that they're necessary to protect the public and to punish these defendants, that it would not be disproportionate to the acts in this matter. That crimes were committed — I believe Mr. Alexander was on probation in juvenile court at the time. And that's another factor. The harm is so great or unusual that a single term would not adequately reflect the seriousness of the conduct. And that juvenile criminal history shows consecutive sentences are necessary to protect the public.

(Tr. 3021-3022.)

**{¶62}** The journal entry states that "the court considered all required factors of the law." "The court finds that prison is consistent with the purpose of R.C. 2929.11."

**{¶63}** The sixth assignment of error is overruled.

**G.      Imposition of Court Costs**

**{¶64}** The final assignment of error asserts the improper imposition of court costs.

R.C. 2947.31 addresses court costs:

In all criminal cases, including violations of ordinances, the judge or magistrate shall include in the sentence the costs of prosecution, including any costs under section 2947.231 of the Revised Code, and render a judgment against the defendant for such costs. At the time the judge or magistrate imposes sentence, the judge or magistrate shall notify the defendant of both of the following:

(a)      If the defendant fails to pay that judgment or fails to timely make payments towards that judgment under a payment schedule approved by the court, the court may order the defendant to perform

community service in an amount of not more than forty hours per month until the judgment is paid or until the court is satisfied that the defendant is in compliance with the approved payment schedule.

**{¶65}** A trial court is entitled to waive court costs for an indigent defendant, and may do so during sentencing or at any time thereafter. *State v. Brock,* 8th Dist. Cuyahoga No. 104334, 2017-Ohio-97, ¶ 18, citing R.C. 2947.23(C), and *State v. Brown*, 8th Dist. Cuyahoga No. 103247, 2016-Ohio-1546, ¶ 13.

**{¶66}** The trial court's entry provides:

The defendant is ordered to perform CCWS in lieu of paying costs. Defendant advised of appeal rights. Defendant indigent, court appoints [COUNSEL] as appellate counsel. Transcript at state's expense. The court hereby enters judgment against the defendant in an amount equal to the costs of this prosecution.

**{¶67}** The court acted within its statutory discretion by imposing court costs regardless of Alexander's financial status, "by ordering the payment of court costs to be from community work service in prison." *Brock* at ¶ 19. The seventh assignment of error is overruled.

**{¶68}** Judgment is affirmed.

It is ordered that the appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

PATRICIA ANN BLACKMON, J., CONCURS;
EILEEN T. GALLAGHER, P.J., CONCURS IN JUDGMENT ONLY